| | # Black Candidates Who Would have Advanced to General Election Among Just Black Electorate Only | # Black Candidates Who Did Advance to General Election |
|---|---|---|
| I NI | 4 | 2 |

Mary GLOVER, et al., Plaintiffs,

v.

Perry JOHNSON, et al., Defendants.

No. 77–CV–71229.

United States District Court,
E.D. Michigan,
Southern Division.

Feb. 19, 1999.

Deborah A. LaBelle, Ann Arbor, MI, Michael A. Barnhart, Detroit, MI, for plaintiffs.

Leo H. Friedman, Asst. Attorney General, Lansing, MI, for defendants.

## *OPINION*

FEIKENS, District Judge.

### Introduction

I have before me on remand the task to revisit the underlying constitutional issues of this complex prison reform case twenty years after my unappealed judgment against defendants on those same issues in *Glover v. Johnson*, 478 F.Supp. 1075, 1077 (E.D.Mich.1979). The procedural explanation for how the case has, in a sense, come to be reborn begins in December 1993, when defendants filed a motion to terminate my continuing jurisdiction pursuant to Fed.R.Civ.P. 60(b)(5) or, alternatively, Fed.R.Civ.P. 60(b)(6).[1] In *Glover v. Johnson*, 879 F.Supp. 752 (E.D.Mich.1995), I denied that motion, concluding that defendants still had not substantially complied with my remedial orders and plans. *See id.* at 759–60. On appeal, the U.S. Court of Appeals for the Sixth Circuit ("Sixth Circuit") vacated my denial and defined the bounds of my task:

To restate the matter for purposes of emphasis, the federal court's authority—the district court's and this court's—to intrude itself into the operation of Michigan's prison system is limited to assuring (1) that *sufficient parity* is achieved between male and female inmates in matters of educational and vocational opportunities as satisfies the demands of the Equal Protection Clause of the Fourteenth Amendment, and (2) that female inmates have the level of access to the courts that is constitutionally required under the First Amendment.

*Glover v. Johnson*, 138 F.3d 229, 242 (6th Cir.1998) (emphasis added).

I addressed the concept of parity under the Equal Protection Clause in my original opinion in this case. *See Glover*, 478 F.Supp. at 1079. There I wrote:

The term "parity of treatment" describes concisely the standard to which, I believe, the State ought to be held in its treatment of female prisoners. In other words, Defendants here are bound to provide women inmates with treatment and facilities that are substantially equivalent to those provided the men—i.e., equivalent in substance if not in form—unless their actions, though failing to do so, nonetheless bear a fair and substantial relationship to achievement of the State's correctional objectives.

*Id.* The Sixth Circuit referred to this passage in its remand opinion, stating that I had "correctly identified the remedial goal to be achieved in this litigation—*parity in the treatment of male and female prisoners.*" *Glover*, 138 F.3d at 241 (emphasis in original). The court then carefully outlined how I should pursue this goal:

[T]he district court shall conduct hearings and receive evidence, including stipulations by the parties, in order to determine with particularity the educational, vocational, apprenticeship, and work-pass opportunities presently being provided (1) to *male* inmates and (2) to *female* inmates in the

---

1. Fed.R.Civ.P. 60(b)(5) and (6) reads in pertinent part:

    On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.

Michigan correctional system. The district court will then make particularized findings of fact and conclusions of law determining whether the male and female inmates are presently being provided sufficiently comparable education, vocational, apprenticeship, and work-pass opportunities as to satisfy the requirements of the Equal Protection Clause of the Fourteenth Amendment.

*Id.* at 243 (emphasis in original).

Finally, the court directed:

In undertaking this task, the district court must take into account the present conditions of custody and population size at various institutions; any differences in educational and vocational interests between male and female inmates; available educational and vocational training resources; and such other considerations as the district court may deem appropriate.

*Id.*

To restate the focus of my task, it is this: to determine whether sufficient parity of treatment under the Equal Protection Clause of the Fourteenth Amendment has *presently* been achieved between male and female inmates in the Michigan prison system in the matters of educational, vocational, apprenticeship, and work-pass opportunities.[2] The scope of my task no longer includes consideration of the First Amendment right to access issue because the parties have recently agreed to settle that issue based on the Sixth Circuit's resolution of the *Knop v. Johnson* and *Hadix v. Johnson* appeals, as well as Chief Judge Richard A. Enslen's unappealed rulings and orders in those cases.[3]

Before I turn to the merits of the parity issue, I must delineate the standard of review that the Equal Protection Clause demands in the prison setting.[4]

## I. Prisons and Equal Protection

At the time of my original opinion, the inmate plaintiffs' claim of facial gender discrimination in violation of the Equal Protection Clause was novel. So much so, in fact, that my research uncovered only one case, an unpublished district court opinion, that dealt with facial gender classifications in the prison setting. *See Glover,* 478 F.Supp. at 1078–79 (quoting from *Barefield v. Leach,* No. 10282 (D.N.M.1974)). The Supreme Court had not spoken in any way on the issue of equal protection in a prison setting, although it had written on the deferential considerations a federal court must address whenever it applies constitutional law to prisons. *See, e.g., Jones v. North Carolina Prisoners' Labor Union,* 433 U.S. 119, 125, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977) (noting that judicial branch must give "appropriate deference to the decisions of prison administrators and appropriate recognition to the peculiar and restrictive circumstances of penal confinement"). Given that there was no case law in 1979 indicating that I should treat female prisoners differently than any other plaintiff alleging facial discrimination on the basis of gender, I chose to apply the heightened scrutiny standard of review first developed in *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), to the plaintiffs' equal protection claim. *See Glover,* 478 F.Supp. at 1078 (quoting *Craig* standard).

After the passage of almost two decades, however, new case law and the hard lessons

---

**2.** I emphasize the distinction the Sixth Circuit has drawn in defining my task. By requiring me to evaluate the present conditions of parity, the Sixth Circuit has implicitly asked me to measure the results of defendants' remedial efforts against the standard of parity that the Equal Protection Clause *presently* requires. With this task, therefore, I am not reconsidering the issue of constitutional liability adjudicated in 1979.

**3.** The appeals before the Sixth Circuit are Nos. 96–2387, 96–2397, 98–2391, and 99–1007. The first two are pending and concern Chief Judge Enslen's order of October 1, 1996. The parties have, in effect, agreed to adopt for the female

facilities whatever legal access remedy the Sixth Circuit and Chief Judge Enslen (through his unappealed rulings) find to be suitable for the male facilities. (*See* Def.s' Proposed Findings of Fact and Conclusions of Law at 50–52; Pl.s' Amended Findings of Fact and Conclusions of Law at 2, n. 1.)

**4.** I find it unnecessary to repeat the extensive history of this case. My findings in this opinion are the result of the record developed through an eight day evidentiary hearing that began on January 11, 1999 and eventually ended on February 9, 1999.

of this case raise a question as to whether a different standard of review should be applied to equal protection cases in a prison setting. The Supreme Court again addressed the issue of deference to legitimate institutional needs in the operations of state prisons. As the Court reasoned in *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981):

> [T]he problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism.

*Id.* at 351, n. 16, 101 S.Ct. 2392 (quoting *Procunier v. Martinez*, 416 U.S. 396, 404–05, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974)). The now well-established policy of judicial deference springs from the related principles of institutional competence, federalism, and separation of powers. *See Preiser v. Rodriguez*, 411 U.S. 475, 491–92, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973) ("It is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of prisons"); *Bell v. Wolfish*, 441 U.S. 520, 548, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) ("the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial").

In *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), the Supreme Court hardened the policy of judicial deference into a reasonableness standard of review for prisoners' constitutional claims. The plaintiff prisoner class in *Turner* had challenged the constitutionality of a regulation restricting correspondence between inmates and a regulation limiting the inmates' ability to marry. *See id.* at 81–82, 107 S.Ct. 2254. In evaluating plaintiffs' claims, the Court defined its task as having "to formulate a standard of review for prisoners' constitutional claims that is responsive both to the 'policy of judicial restraint regarding prisoner complaints and [to] the need to protect constitutional rights.'" *Id.* at 85, 107 S.Ct. 2254 (quoting *Procunier*, 416 U.S. at 406, 94 S.Ct. 1800). The Court held that:

> [W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. In our view, such a standard is necessary if "prison administrators ..., and not the courts, [are] to make the difficult judgments concerning institutional operations."

*Id.* at 89, 107 S.Ct. 2254 (quoting *Jones*, 433 U.S. at 128, 97 S.Ct. 2532). The Court justified its holding by reference to those same principles of institutional competence, federalism, and separation of powers that have become necessarily commonplace in constitutional litigation involving prisons. As the Court explained:

> Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decision-making process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby "unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration."

*Id.* (quoting *Procunier*, 416 U.S. at 407, 94 S.Ct. 1800). Through *Turner*, then, the Supreme Court has altered the general constitutional approach in the prison context in order to fashion a more satisfactory balance between the legitimate institutional needs of state prisons and the overarching demands of the Constitution. The Court's recent use of *Turner* to reverse a district court's remedial

order for intrusiveness demonstrates how this new balance applies in prison administration. *See Lewis v. Casey*, 518 U.S. 343, 361–63, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996).

*Pitts v. Thornburgh*, 866 F.2d 1450 (D.C.Cir.1989), is the only case that has addressed the issue whether *Turner* supplies the standard for equal protection claims alleging facial gender discrimination in the prison context. In *Pitts*, the court held that where gender discrimination is based on a facial classification, heightened scrutiny remains the appropriate standard of constitutional review, despite *Turner*. *See id.* at 1453–55. The court states two reasons for holding *Turner* inapplicable: first, the equal protection claim in *Pitts* challenged "general budgetary and policy choices made over decades," while *Turner* involved "regulations that govern the day-to-day operation of prisons," *id.* at 1453–54; and, second, facial gender discrimination remains "a classification that traditionally summons heightened scrutiny" under the Equal Protection Clause, *id.* at 1454.

I find the first reason offered in *Pitts* unpersuasive because it reads *Turner* too narrowly. While *Turner* does focus predominantly on regulations, and not on policy, the deferential concerns of *Turner* nevertheless encompass both administrative policy and regulations. I read *Turner* to govern, at minimum, judicial review of any prison administrative decision, whether a policy directive or security regulation, that has been challenged as an improper restriction on a prisoner's constitutional protections. I believe the Supreme Court's reliance on *Turner* in its *Lewis* decision reflects a similar understanding of *Turner*'s scope. *See Lewis*, 518 U.S. at 361–63, 116 S.Ct. 2174 (discussing how the district court "failed to accord adequate deference to the judgment of the prison authorities").

The second reason offered in *Pitts* also fails to persuade me. It is not a sufficient response to *Turner* to reason that heightened scrutiny should apply simply because that is what has traditionally been applied. This argument certainly did not save the basic First and Fourteenth Amendment constitutional rights at issue in *Turner* from evaluation under the deferential standard of reasonable relation. Moreover, the Supreme Court framed the issue in *Turner* in general terms. The Court's description of that issue is worth repeating: "Our task . . . is to formulate a standard of review for prisoners' constitutional claims that is responsive both to the 'policy of judicial restraint regarding prisoner complaints and [to] the need to protect constitutional rights." *Turner*, 482 U.S. at 85, 107 S.Ct. 2254. There is no qualification in the Court's statement when it speaks of "a standard of review for prisoners' constitutional claims." *Id.*

Although I recognize that *Turner* did not explicitly mandate a reasonableness test for gender-based classifications, I nevertheless find it to be dispositive on the issue of which standard of review is proper for this inquiry. Plaintiffs have offered the Supreme Court's recent clarification of the heightened scrutiny standard of review in *United States v. Virginia*, 518 U.S. 515, 533, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (holding that state mandated single-sex schooling violated the Equal Protection Clause of the Fourteenth Amendment), as the proper case to apply. In most other situations of facial gender classifications, it would be. Yet, here, where I am faced with the daunting equal protection task of comparing the State of Michigan's male and female prison programming, a task that inherently requires me to examine the intricacies of administrative judgments made by prison officials, I find that the deferential concerns of *Turner* necessarily hold primary sway over the scope of my constitutional review. The reasonable relation test laid out in *Turner* therefore governs the parity inquiry.

In adopting this standard, I do not suggest that the inquiry will rework old ground. As the Sixth Circuit has recognized, my 1979 judgment on constitutional liability and the findings of law and fact that support it are the law of the case. *See Glover*, 138 F.3d at 254. What is before me now, then, is the necessity of making a judgment on the present parity of conditions, or lack thereof, between male and female inmate programming "as measured by the Equal Protection Clause

of the Fourteenth Amendment ... as authoritatively interpreted." *Id.* Inherent in this exercise is the application of constitutional doctrine as it presently stands. I conclude that an equal protection case involving gender-based classifications in a prison setting cannot be evaluated today without using the reasonable relation standard of *Turner.* By applying *Turner* rather than *Craig,* I am not modifying my 1979 judgment on constitutional liability; rather, I am re-evaluating the constitutional adequacy of defendants' remedial efforts through the framework of an evolving constitutional doctrine.

My 1979 judgment has two further consequences for the equal protection analysis of this inquiry. First, this remains a case about the consequences of a *facial* gender classification drawn by the State of Michigan. In my original judgment, I found that plaintiffs' equal protection claim challenged the disparate effects of the State's facial gender classification on the educational, vocational, apprenticeship, and work-pass opportunities afforded the female inmates. *See Glover,* 478 F.Supp. at 1080. As defined by the Sixth Circuit, the present inquiry does not, and cannot, question this finding of facial discrimination because to do so would be to improperly re-open the unappealed liability judgment in this case.

Second, my finding that male and female inmates are similarly situated likewise remains binding. Recently, the U.S. Court of Appeals for the District of Columbia and the U.S. Court of Appeals for the Eighth Circuit have held that inmates segregated on the basis of gender are not similarly situated for purposes of the Equal Protection Clause. *See Women Prisoners of D.C. Dep't of Corrections v. D.C.,* 93 F.3d 910, 924–27 (D.C.Cir.1996), *cert. denied,* 520 U.S. 1196, 117 S.Ct. 1552, 137 L.Ed.2d 701 (1997); *Klinger v. Dep't of Corrections,* 31 F.3d 727, 731–733 (8th Cir.1994), *cert. denied,* 513 U.S. 1185, 115 S.Ct. 1177, 130 L.Ed.2d 1130

(1995). In contrast, I originally concluded that the State of Michigan treated similarly situated male and female inmates dissimilarly. *See id.* at 1077–78. While *Women Prisoners* and *Klinger* are instructive in that they demonstrate the new spirit of judicial deference in the prison context, they do not re-open my earlier liability determination that the male and female inmates in Michigan are similarly situated.

I turn now to my findings of fact and conclusions of law on the issue of parity of treatment.

## II. Parity of Treatment

Because the Sixth Circuit restricted this parity inquiry to the present conditions of male and female educational, vocational, apprenticeship, and work-pass opportunities, I limited the parties' discovery to the conditions that existed during 1998. Counsel for plaintiffs has repeatedly objected to this limitation, asserting that it is unfair because it prevents plaintiffs from developing a full, historical analysis of defendants' remedial achievements. I rejected counsel's argument, however, because historical analysis is unnecessary to the inquiry before me. The Sixth Circuit has clearly mandated a present focus. *See Glover,* 138 F.3d at 254. My review of the *status quo* of male and female inmate programming does not depend on how conditions once were, but only on how conditions are now.

Before individually addressing the four programming areas at issue in this inquiry, I first make those factual findings that relate to the State of Michigan's prison system as a whole. As of October 31, 1998, the Michigan Department of Corrections ("MDOC") housed 40,506 inmates within thirty-nine major facilities and thirteen camp facilities.[5] (*See* Def.s' Ex. 2.) Of that total population, 38,701 were male and 1,806 were female. (*See id.*) The combined number of male inmates housed in the thirty-seven major

---

**5.** This inmate population total does not include inmates assigned to the Huron Valley Center ("HVC") or the Reception and Guidance Center ("RGC"). (*See* Def.s' Proposed Findings of Fact and Conclusions of Law at 1, n. 1.) HVC is an MDOC facility operated by the Michigan Department of Community Health. (*See id.*) Inmates housed at HVC receive mental health services. RGC inmates are males 21 years of age and older who are recent court commitments, administrative transfers, medical or psychiatric transfers, prison escapees, parole violators, or Residential and Electronic Programs' Trustees with new prison sentences. (*See id.*)

male facilities was 35,824, while the combined number of female inmates housed in the two major female facilities was 1,394.[6] (*See id.*) The combined number of male inmates housed in the twelve male camp facilities was 2,877, while the number of female inmates housed in the lone female camp facility was 412. (*See id.*)

In addition to segregating inmates by gender, MDOC further classifies and segregates inmates by security risk. A Level I inmate presents the least risk, while a Level VI inmate presents the most. (*See* Test. of Special Administrator Nancy Zang ("Zang"), Tr., Vol. II at 129–31.) The full spectrum of possible security classifications is: I, II, III, IV, V, and VI. (*See id.*) There are no female inmates classified as either Level III or Level VI. (*See id.*) All male and female inmates housed in the camp facilities are classified as Level I. (*See* Def.s' Ex. 2.) Apparently, there are also special Level I facilities for male inmates that are known as "secure" Level I facilities; no such facility exists for the female inmates. (*See* Zang, Tr., Vol. II at 131.)

Based on the evidence contained in defendants' exhibit two, which was current as of October 31, 1998, the populations and security classification levels for each major male facility were:

| FACILITY | (Abbr.) | POPULATION | SECURITY LEVEL |
|---|---|---|---|
| Adrian Temporary | ATF | 957 | Secure I |
| Alger Maximum | LMF | 532 | V |
| Baraga Maximum | AMF | 592 | V |
| Brooks | LRF | 1,214 | I, II, IV |
| Carson City Temp | OTF | 956 | II |
| Carson City Correctional | DRF | 1,248 | I, II, IV |
| Chippewa Temp | KTF | 960 | II |
| Chippewa Regional | URF | 1,189 | I, III, IV |
| Cotton Correctional | JCF | 1,650 | I, II, III, IV |
| Egeler Correctional | SMN | 1,008 | II |
| Gus Harrison | ARF | 1,240 | I, II, IV |
| Michigan Training Unit | MTU | 1,307 | II |
| Hiawatha Temporary | HTF | 957 | Secure I |
| Huron Valley Men's | HVM | 477 | IV |
| Ionia Maximum | ICF | 554 | II, VI |
| Ionia Temporary | ITF | 959 | Secure I |
| Kinross Correctional | KCF | 1,218 | II |
| Lakeland Correctional | LCF | 1,195 | Secure I, II |
| Macomb Correctional | MRF | 1,240 | I, II, IV |
| Marquette Branch Prison | MBP | 1,116 | I, V |
| Michigan Reformatory | RMI | 1,256 | I, IV |
| Mid–Michigan Temporary | STF | 960 | Secure I |
| Mound Correctional | NRF | 1,055 | II, IV |
| Muskegon Correctional | MCF | 1,292 | III |
| Muskegon Temporary | MTF | 956 | Secure I |
| Newberry Correctional | NCF | 921 | II |
| Oaks Correctional | ECF | 707 | V |
| Riverside Correctional | RCF | 767 | IV |
| Ryan Regional | RRF | 1,051 | II, IV |
| Saginaw Correctional | SRF | 1,239 | I, II, IV |
| SPSM–Central Complex | SMI | 176 | IV |
| Parnall Correctional | SMT | 1,444 | I |
| Standish Maximum | SMF | 508 | V |
| Thumb Correctional | TCF | 854 | II, IV |
| Western Wayne | WCF | 746 | III |
| Cooper Street | JCS | 815 | Secure I |

**6.** This population number does not include female inmates housed at the Scott Correctional Facility Reception and Guidance Center.

| FACILITY | (Abbr.) | POPULATION | SECURITY LEVEL |
|---|---|---|---|
| Southern Michigan | JMF | 610 | IV |

Also based on defendant's exhibit two, the populations for each male camp facility on October 31, 1998 were:

| CAMP | (Abbr.) | POPULATION |
|---|---|---|
| Brighton | CBI | 214 |
| Cusino | CCU | 320 |
| Koehler | CKO | 239 |
| Kitwen | CKT | 238 |
| Lehman | CLE | 338 |
| Manistique | CMQ | 208 |
| Ojibway | COJ | 409 |
| Ottawa | COT | 238 |
| Pellston | CPL | 129 |
| Pugsley | CPP | 139 |
| Sauble | CSA | 150 |
| Tuscola | CTU | 255 |

The two major female facilities are Florence Crane ("Crane") and Scott Correctional ("Scott"). (*See* Def.s' Ex. 2.) On October 31, 1998, Crane housed 546 female inmates, all of which MDOC had classified as Level II security risks. (*See id.*) On the same date, Scott housed a total population of 848 female inmates, the individuals of which were assigned either Level I, II, IV, or V security classifications. (*See id.*) The one female camp facility is Camp Branch, which on October 31, 1998 housed a total population of 412 Level I female inmates. (*See id.*)

Against this background, I first address whether the educational opportunities provided to the male and female inmates in the State of Michigan prison system are sufficiently comparable so as to satisfy the demands of the Equal Protection Clause.

**A. Educational Opportunities**

■ Beginning with the 1979 judgment, I have restricted the scope of this area to a narrow comparison of those post-secondary or college programming opportunities available to male and female inmates in the State's prison system. *See Glover,* 478 F.Supp. at 1083. The parties' evidence on educational opportunities that concerns or includes MDOC's present offerings of Adult Basic Education ("ABE"), English as a Second Language ("ESL"), General Education Development ("GED"), special education, and paralegal training is therefore irrelevant to my analysis in this area. Evidence on college paralegal training is further irrelevant because I have ruled that such evidence pertains to the First Amendment right to access issue that is no longer a disputed part of this proceeding. (*See* Tr., Vol. II at 58–59.)

All male and female inmates may seek college education through correspondence courses undertaken at the inmate's expense pursuant to the requirements of MDOC Policy Directive 05.02.119. (*See* Def.s' Ex. 1E.) As noted in subsection EE of MDOC Policy Directive 05.02.112, college programming at State expense is not offered unless required by court order. (*See* Def.s' Ex. 1C.) Only three MDOC facilities provide college programming at State expense and all do so pursuant to my orders. Those facilities are the Egeler Correctional Facility ("SMN") [7], a major male facility, and Scott and Crane, the only two major female facilities. (*See* Def.s' Ex.'s 3 & 4.)

MDOC permits all female inmates to participate in college programming at State ex-

---

7. While the prison facilities at the Southern Michigan prison are in complete renovation, college programs, which were earlier offered there, are now offered only at Egeler. Section IV.H.2 of the *Hadix* Consent Decree required the MDOC to submit a plan providing for "meaningful out-of-cell activity" at the Southern Michigan prison. The plan submitted, and then approved by my order, provides for college programming for the male inmates housed at Southern Michigan.

pense if they meet certain basic and sensible MDOC eligibility requirements—for example, an inmate must verify that she has a GED or high school diploma—as well as the particular admission requirements of the college. (*See* Def.s' Ex. 1F.) Female inmates at the Camp Branch facility accordingly have the ability to transfer to the Crane facility if they wish to attend college programming at State expense. (*See* Zang, Tr., Vol. II at 154–55 & 159–60.) In great contrast, male inmates not housed at SMN do not have the ability to transfer to SMN to enroll in the college programming offered there at State expense. (*See id.* at 154.)

As of October 31, 1998, 245 female inmates were enrolled in associate degree programming, and 120 female inmates were enrolled in baccalaureate degree programming. (*See* Def.s' Ex. 3.) Also on October 31, 142 male inmates at the Egeler facility were enrolled in associate degree programming, and 43 male inmates at the same facility were enrolled in baccalaureate degree programming. (*See id.*) These numbers result in a 20.210% enrollment rate in college programming for the total female inmate population, and a 0.478% enrollment rate in college programming for the total male inmate population.[8] Also noteworthy are MDOC budget expenditures on college programming for FY 1998; MDOC spent $392,544 on male inmate college programming during that period and $715,339 on female inmate college programming. (*See* Def.s' Ex. 6, Table VI.)

Another useful factor to consider are the number and types of degree programs offered. Male inmates at SMN can presently choose to enroll in associate degree programs in Business Administration, Accounting, Business Data Processing, and Arts & Science, as well as in baccalaureate degree pro-

grams in Business Administration and Behavorial Sciences. (*See* Pl.s' Ex. 37.) As of October 31, 1998, male inmates were enrolled in all of these programs. (*See id.*) Female inmates at Crane can presently enroll in certificate degree programs in Application Software and Applied Informations Systems, associate degree programs in Business Management and Liberal Arts, and a baccalaureate degree program in Applied Liberal Studies. (*See id.*) As of October 31, 1998, female inmates at Crane were only enrolled in the Liberal Arts and Applied Liberal Studies degree programs. (*See id.*) Female inmates at Scott can presently enroll in a certificate degree program in Information Processing Assistant, associate degree programs in Business Administration, Business Data Processing, Liberal Arts, and General Studies, and baccalaureate degree programs in Business Administration and Behavioral Sciences. (*See id.*) As of October 31, 1998, female inmates at Scott had enrolled in each program except Business Administration (associate), Applied Information Systems, Information Processing Assistant, and General Studies. (*See id.*)

Despite the weight of the evidence discussed, which demonstrates that the female inmates receive substantially equivalent educational opportunities to those afforded the male inmates, plaintiffs argue that the present body of evidence before me is insufficient for a ruling on parity in this area. (*See* Pl.s' Amended Findings of Fact and Conclusions of Law at 18–19.) Based on the testimony of their educational expert, Dr. Richard Meisler, plaintiffs contend that any worthwhile examination of educational parity must consider historical evidence regarding degree completion rates and progress, as well as evidence on the structure and coherence of

---

8. I came to the 20.210 % result by dividing the total number of female inmates enrolled in college programming (365) by the total population of female inmates (1,806). I came to the 0.478 % result by likewise dividing the total number of male inmates enrolled in college programming (185) by the total population of male inmates (38,701).

Defendants' enrollment rates differ from mine. For the total female inmate population, defen-

dants calculated a 22 % rate. (*See* Def.s' Proposed Findings of Fact and Conclusions of Law at 28.) For the total male inmate population, defendants calculated a 0.004 % rate. (*See id.*) Defendants' female rate appears to be inaccurate because defendants may have included paralegal enrollment numbers in their calculations. Defendants' male rate is the result of mathematical error.

degree programs. (*See id.; see also* Test. of Dr. Richard Meisler ("Meisler"), Tr., Vol. II at 61–64.) I disagree. Plaintiffs essentially ask me to compare the quality of the degree programs offered to the male and female inmates. Absent allegations, however, that the MDOC intentionally offers "sham" courses, allegations rightly not made here, I do not believe I may pursue that line of inquiry in light of the deferential considerations of *Turner, Lewis,* and the Sixth Circuit's mandate.

Additionally, the evidence on record is more than sufficient for a ruling. I have evidence on MDOC policy regarding access to degree programs, on the number and types of degree programs available, on enrollment numbers and rates, and on budgetary expenditures on college programming. Viewed in its totality, this evidence decisively indicates that female inmates presently have sufficiently comparable educational opportunities to those provided to male inmates; in other words, the State of Michigan's facial gender classification presently has no disparate effect on female inmates with respect to educational opportunities. I therefore conclude that sufficient parity of treatment under the Equal Protection Clause has presently been achieved by defendants in the matter of educational programming.

## B. Vocational Opportunities

█ Plaintiffs' primary argument in this area is that the female inmates do not have a range of vocational opportunities substantially equivalent to that of the male inmates. (*See* Pl.s' Amended Findings of Fact and Conclusions of Law at 3–4.) Based on the expert report and testimony of Dr. Bruce Wolford, defendants contend, however, that when the female facilities are compared to "benchmark" male facilities of similar charac-

teristics, parity in vocational opportunities is evident. (*See* Def.s' Ex. 6; *see also* Test. of Dr. Bruce Wolford ("Wolford"), Tr., Vol. VI at 8–10.)

According to MDOC records, seventeen vocational programs were available to male inmates as of October 31, 1998: print shop, optical technology, auto body repair, small engine repair, welding, electronics, building trades/restoration, building trades/theory, meat cutting, t.v. production, machine tool operation, business education technology, graphic arts/print shop, food service/management, horticulture, institutional maintenance, and auto mechanics. (*See* Def.s' Ex. 5.) Here are the seventeen vocational programs ranked by the number of times each is offered by a facility: institutional maintenance (25 facilities offer), horticulture (12), building trades/restoration (11), food service/management (10), business education technology (9), auto mechanics (4), electronics (2), graphic arts/print shop (2), meat cutting (2), welding (2), auto body repair (1), building trades/theory (1), machine tool operation (1), optical technology (1), print shop (1), small engine repair (1), and t.v. production (1). (*See id.*) As of October 31, 1998, thirty-two of the thirty-seven major male facilities offered at least one vocational program. (*See id.*) Most of the thirty-two facilities offered one to three programs each, and only seven of the thirty-two offered between four to six vocational programs each. (*See id.*) No male facility offered more than six vocational programs. (*See id.*) With regard to enrollment counts, 1,961 male inmates were enrolled in a vocational program as of October 31, 1998; this results in a 5.473 % enrollment rate for the total population of male inmates in major facilities.[9] (*See id.*)

According to MDOC records, seven vocational programs were available to fe-

---

9. I calculated the 5.473 % rate by dividing the total number of male inmates enrolled in a vocational program (1,961) by the total number of male inmates in the major facilities (35,824). I used the major facilities population number because, regardless of gender, camp facilities in the State of Michigan prison system do not offer vocational programming. Male inmates in camp facilities cannot transfer to a major facility in order to enroll in vocational programming; thus, the total number of male inmates theoretically eligible for vocational programming must be lessened by the total number of male inmates in camp facilities. (*See* Zang, Tr., Vol. I at 152–53.)

Certainly my enrollment rate for the male inmates is a rough one. Some may be enrolled in more than one vocational program. If anything, then, my rate is likely to be high.

male inmates as of October 31, 1998: auto mechanics, building trades/restoration, business education technology, food service/management, graphic arts, horticulture, and institutional maintenance. (*See id.*) The Crane facility offered four programs: business education technology, food service/management, graphic arts, and horticulture. (*See id.*) The Scott facility offered six programs: auto mechanics, building trades/restoration, business education technology, institutional maintenance, food service/management, and graphic arts. (*See id.*) A male facility, Western Wayne, is the actual site of the auto mechanics and building trades/restoration programs offered to Scott inmates; inmates attending those two programs leave Scott during the time allotted for their instruction. (*See id.; see also* Zang, Tr., Vol. I at 95–99.) With regard to enrollment counts, 130 female inmates were enrolled in a vocational program as of October 31, 1998; this results in a 7.198 % enrollment rate for the total population of female inmates incarcerated by the State of Michigan.[10] (*See* Def.s' Ex. 5.)

Both parties, but especially plaintiffs, have urged me to include other programs within the arena of officially listed vocational programs. Defendants accordingly imply that I should recognize unlisted female programs in denture technology and pre-vocational computer lab training as vocational programs. (*See* Def.s' Proposed Findings of Fact and Conclusions of Law at 33.) Plaintiffs explicitly urge me to recognize the following male programs as vocational programs: power plant operations, barber training, substance abuse education, the bloodborne pathogens course, and the We Stand Sincere job seeking skills program. (*See* Pl.s' Amended

Findings of Fact and Conclusions of Law at 6.) Whatever their merits, I will not consider any of these programs to be vocational programs for the purposes of this inquiry. Some quite clearly do not belong within the vocational category, while others have not been a part of the history of my previous deliberations in this case. Furthermore, it would be unfair to both parties to include, at this late date in the case, these few additional programs of uncertain existence.

Even with a few of these additional vocational programs thrown in the mix, I do not believe the central thrust of the evidence would be altered. Given the established vocational programs mentioned above, I find that the female inmates are provided a sufficiently comparable set of vocational opportunities to those provided to the male inmates. While the literal number of vocational programs offered varies, with seventeen offered to the male inmates as a group and seven offered to the female inmates as a group, this crude fact alone cannot be dispositive. A more sophisticated comparison of male and female inmate programming reveals that the six most frequently offered male vocational programs—institutional maintenance, horticulture, building trades/restoration, food service/management, business education technology, and auto mechanics—are also offered to all of the female inmates. These six are the programs most likely to be available to male inmates and also the ones that most of the enrolled male inmates attend. Thus, by also providing these core programs to the female inmates, the State has offered a range of vocational opportunities that is substantially the same.

Also indicative of the parity of treatment in vocational opportunities are the substantially similar enrollment rates for male and

---

10. I calculated the 7.198 % rate by dividing the total number of female inmates enrolled in a vocational program (130) by the total number of female inmates incarcerated (1806). Unlike male inmates, female inmates who desire to enroll in vocational programming may be transferred out of the lone camp facility, Camp Branch, and into the Crane facility; thus, the total number of female inmates theoretically eligible for vocational programming is the same as

the total number incarcerated. (*See* Def.'s Proposed Findings of Fact and Conclusions of Law at 42–44.)

Just as with the male enrollment rate, my calculation of 7.198 % is likely to be a rough proxy. Nevertheless, there is value in calculating these enrollment rates because a comparison demonstrates no substantial gap between the rates for men and women.

female inmates: 5.473 % and 7.198 % respectively. Although a comparison of these rates alone would be an incomplete measure of parity, the rates, in combination with the evidence of substantially similar core offerings, add significant weight to defendants' claims of parity. It is important to observe at this point that the Equal Protection Clause does not require identical treatment; thus, the mere fact that some of the fringe vocational programs are provided only to male inmates does not disturb well-established equal protection principles. Moreover, the failure to treat identically is mitigated by the fact that all female inmates who desire vocational training and meet MDOC eligibility requirements have access to vocational opportunities, whereas the same is not true for all male inmates who desire vocational training and meet MDOC eligibility requirements—those in camp facilities cannot transfer to a major facility for the purpose of enrolling in a vocational program. (*See* Zang, Tr., Vol. I at 152–153.)

Even if the literal difference in the present number of vocational programs offered to male and female inmates were to constitute dissimilar treatment under the Equal Protection Clause, that dissimilar treatment would nevertheless be permissible under the reasonable relation standard as articulated in *Turner*. As is implicit in the data on vocational programs in male facilities, legitimate and pragmatic penological interests, such as the need for security and orderliness, necessitate an upper limit on the numbers of vocational programs that any one facility can support. No male facility offers more than six vocational programs. If the female in-

mates were to be provided all of the vocational programs currently provided the men, the Scott and Crane facilities would be asked to bear more programs than could reasonably be supported. *Turner* counsels me to respect the experienced judgment of prison administrators on this point.

A lesser argument for plaintiffs than their "comparable range" argument is the contention that the vocational programming available to the female inmates is not comparable in quality to the same programs offered the male inmates. (*See* Pl.s' Amended Findings of Fact and Conclusions of Law at 6–7.) As with the related argument in the college programming area, I have rejected this contention regarding quality in light of the guidance of the Sixth Circuit's remand opinion and the deferential considerations of *Turner*. There are no allegations of "sham" vocational programs. *Turner* requires me to presume that the MDOC is acting in good faith when it develops the content of a vocational program. I find I am not required to delve into detailed comparisons of curriculae, textbooks, equipment, and instructors in determining the parity issue before me.

Plaintiffs additionally raise three minor arguments against a finding of parity: 1) vocational programming is only available to female inmates on a part-time basis; 2) male inmates receive supplemental vocational programming through the On–the–Job–Training program ("OJT"); and 3) the MDOC places extra limitations on the participation of female inmates in vocational programming. (*See id.* at 8–10.) My duty under *Turner* to treat administrative decisionmaking with deference dispenses with the first [11] and third [12]

---

11. Ms. Zang has testified that most of the male inmate vocational programming is part-time and that full-time programming is a rarity. (*See* Tr., Vol. II at 148–49.) Thus, the MDOC's decision to restrict female programming to part-time only does not appear to be a substantial disparity, especially one of constitutional dimensions in light of *Turner*.

12. Defendants fully admit to one set of extra limitations—stricter eligibility requirements for female inmates enrolling in the two programs held at the male Western Wayne facility—but note that they are necessary in order to maintain security while transporting the inmates to and

from the Scott facility. (*See* Zang, Tr., Vol. I at 95–96.) Surely these security concerns qualify under *Turner* as legitimate penological interests that rightfully restrict constitutional protections.

Plaintiffs also contend that the following is a constitutionally improper "extra limitation": MDOC's requirement that Level I female inmates can only take vocational programming if they agree to be categorized as Level II security risks. (*See id.* at 89–90, 107 S.Ct. 2254.) No such requirement exists for Level I male inmates. (*See* Def.s' Ex. 5.) Once again, however, I defer to the decision of the prison administrator as this particular limitation falls within the realm of legitimate security concerns protected by *Turner*.

arguments. As to the second argument, the evidentiary record is unclear and, at most, suggests that a very small number of male facilities do provide OJT programs that may supplement core vocational programs. (*See* Pl.s' Ex. 7, noting that seven male facilities reported some OJT students.) Ms. Zang has testified that these OJT reports may be erroneous.[13] (*See* Zang, Tr., Vol. I at 130–34.) Given the uncertain nature of the OJT evidence and the small number of facilities reporting it, I find that the supplementary OJT programs, if they exist at all, do not alter the balance of the evidence, which weighs in favor of a finding of parity in vocational opportunities.

I conclude that sufficient parity of treatment under the Equal Protection Clause has presently been achieved by defendants in the matter of vocational programming. I emphasize that my holding does not rely on the conclusions of defendants' expert witness, Dr. Bruce Wolford, and his "benchmark" methodology, which compares male and female facilities of similar population, security level, and programming characteristics. That facility-by-facility method conflicts with the class-to-class comparison that is the essence of equal protection analysis. Moreover, Dr. Wolford's expert opinion is not reliable because he has admitted in his expert report and under cross-examination that the MDOC essentially imposed the "benchmark" method upon him and, in fact, identified the "benchmark" facilities for him. (*See* Def.s' Ex. 6; *see also* Wolford, Tr., Vol. VI at 37.)

#### C. Apprenticeship Opportunities

■ The area of apprenticeship opportunities in this case has come to include not only traditional apprenticeship arrangements but also prison industries (often referred to as Michigan State Industries ("MSI")) and any OJT programs. As they did with vocational opportunities, plaintiffs argue that the female inmates' range of apprenticeship opportunities is not sufficiently comparable to that of the male inmates. Defendants, with the testimonial support of their apprenticeship expert, Michael J. Mahoney,[14] argue that the female inmates may actually have more apprenticeship opportunities than the male inmates.

Apprenticeships in Michigan's prison system fall under the regulatory oversight of the U.S. Department of Labor's Bureau of Apprenticeship and Training ("BAT"). (*See* Def.s' Ex. 1G; *see also* Test. of Michael J. Mahoney ("Mahoney"), Tr., Vol. V at 49.) Accordingly, MDOC Policy Directive 05.02.122 directs that the overall apprenticeship program "shall be conducted, operated, and administered in conformity with applicable provisions of the Rules and Regulations for the United States Department of Labor for apprenticeship program[s], 29 CFR Part 30, as amended." (Def.s' Ex. 1G.) Standards for apprenticeships must be registered with, and certified by, the BAT in order for the apprenticeship to be valid under federal law. (*See id.*) Under the present standards adopted by MDOC, an "apprenticeable occupation" must involve "manual, mechanical, and technical skills and knowledge clearly identified and commonly recognized throughout an industry" and must require "a minimum of 2,000 hours of on-the-job work experience." (*Id.*)

Evidence on apprenticeship opportunities is limited and, in some respects, questionable. The evidence on the record clearly establishes that, as of October 31, 1998, male inmates had the opportunity to participate in

---

**13.** At my request, Ms. Zang filed an affidavit with the Court on January 20, 1999 regarding potential reporting errors in OJT counts, as well as in apprenticeship counts. (*See* Def.s' Proposed Findings of Fact and Conclusions of Law at 20–25, quoting full text of affidavit.) This affidavit was never admitted to the record and so it is not before me as evidence. As will become clear, the affidavit is, in the end, unnecessary to my rulings.

**14.** Mr. Mahoney also utilizes the controversial "benchmark" methodology I have rejected. (*See* Def.s' Ex. 7, report by Mahoney on apprenticeships, work-pass, and right to access issues.) Thus my ruling on parity in apprenticeship opportunities does not rely on his conclusions.

the following twelve BAT-certified apprenticeships at the Marquette Branch Prison: arborist, carpenter, cook, electrician, farm worker, housekeeper, industrial maintenance, material coordinator, meat cutter, painter, plumber, and refrigeration. (*See* Def.s' Ex. 7, attachment 3; *see also* Pl.s' Amended Findings of Fact and Conclusions of Law at 11.) The evidence on the record also establishes that, as of October 31, 1998, female inmates at the Crane facility could participate in the following five BAT-certified apprenticeships: computer peripheral equipment operator, landscape gardener, building maintenance repair, maintenance electrician, and cook. (*See* Def.s' Ex. 7, attachment 3.) The evidence is also clear that, on the same date, female inmates at the Scott facility could participate in the following six BATcertified apprenticeships: cook, dental assistant, landscape gardener, building maintenance repair, maintenance electrician, and painter. (*See id.*) No camp facility, male or female, offered apprenticeships as of October 31, 1998. (*See* Def.s' Ex. 4.) Female inmates housed at Camp Branch may transfer to the Scott or Crane facilities to participate in apprenticeships, while male inmates housed in camp facilities may not transfer out to participate in apprenticeships. (*See* Zang, Tr., Vol. I at 152–53.)

Participation numbers are low in the apprenticeships mentioned. As of October 31, 1998, eight male inmates were enrolled in apprenticeships at the Marquette Branch prison, five female inmates were enrolled in apprenticeships at the Crane facility, and six female inmates were enrolled in apprenticeships at the Scott facility. (*See* Def.s' Ex. 4.) Based on the monthly reports of each facility, which are in evidence as MDOC business records, plaintiffs argue that substantial, informal apprenticeships appear to exist at two additional male facilities: Huron Valley Men's Facility ("HVM") and Riverside Correctional Facility ("RCF"). (*See* Pl.s' Amended Findings of Fact and Conclusions of Law at 12; *see also* Pl.s' Ex. 4.) If accu-

rate, the monthly reports from these facilities indicate that HVM had 30 male inmates participating in apprenticeships as of April 1998 and that RCF had 14 male inmates participating in apprenticeships as of June 1998. (*See* Pl.s' Ex. 4.) Ms. Zang has testified, however, that she believes the apprenticeship numbers reported by HVM and RCF to be inaccurate due to a computer problem. (*See* Tr., Vol. I at 118–25.) Based on her communications with HVM and RCF officials, Ms. Zang further testified that HVM and RCF do not currently operate apprenticeship programs.[15] (*See id.*)

In any event, I need not rule on the question of the HVM and RCF reports because, even if true, their additional enrollment numbers would not disturb my determination that the State of Michigan presently provides an array of traditional apprenticeship opportunities to the female inmates that is sufficiently comparable to that provided the male inmates. The evidence on record shows that *all* female inmates who desire to participate in an apprenticeship and can meet MDOC eligibility requirements have the opportunity to enroll in seven different kinds of apprenticeships. In telling contrast, only a small portion of all male inmates who desire to participate in an apprenticeship and can meet MDOC eligibility requirements have the opportunity to enroll in the twelve different kinds of apprenticeships offered at the Marquette Branch Prison. In other words, female inmates as a group enjoy much greater access than male inmates as a group. As with vocational opportunities, the literal difference in the numbers—seven as compared to twelve—does not constitute a disparity of constitutional dimension under the Equal Protection Clause. *Turner* affords prison administrators the discretion to develop these prison programs within the constraints of legitimate penological interests. A literal requirement of identical treatment—meaning the same number of programs of identical subject matter would have to be provided to inmates of either gender—would violate *Tur-*

---

**15.** Ms. Zang's affidavit of January 20, 1999, which is not before me as evidence, documents these communications. (*See* Def.s' Proposed Findings of Fact and Conclusions of Law at 20–25, quoting full text of affidavit.)

*ner*'s interpretation of constitutional protections in the prison setting.

The evidence on the record with respect to the MSI and OJT programs does not alter this analysis. Of the 1,192 inmates employed by MSI as of the end of September 1998, 1,130 were male inmates and 62 were female inmates. (*See* Def.s' Ex. 7, attachment 1.) While this may seem a great disparity at first glance, further analysis reveals that the September 1998 employment rates for female inmates as a group compared to those for male inmates as a group are more than comparable: 3.6 % for female inmates versus 2.8 % for male inmates.[16] (*See* Def.s' Ex. 7 at 8.) And although male inmates as a group may have a greater array of MSI programs (twenty as opposed to five), pursuant to *Turner* this is a reasonable restriction on the female inmates given their vastly smaller population size.

The OJT evidence is beset by accuracy concerns. As previously mentioned in this opinion with respect to vocational opportunities, Ms. Zang testified that several of the monthly reports supposedly documenting male inmates enrolled in OJT are erroneous. (*See* Zang, Tr., Vol. I at 130–34.) The male OJT participants reported may actually exist or they may simply be improper classifications by prison officials of inmates participating in informal work arrangements. Likely it is a mix of the two. Whatever the case, the OJT program, which formally exists only for male inmates, is provided by only a few of the thirty-seven major male facilities. (*See* Pl.s' Amended Findings of Fact and Conclusions of Law at 14–15.) Thus as a group, male inmates enjoy only a slight rehabilitative benefit from the OJT programs. Given that female inmates already have a robust and sufficiently comparable opportunity to participate in traditional apprenticeship and prison industry opportunities, this minor benefit to the males does not constitute a disparity in treatment under the Equal Protection Clause.

16. Mr. Mahoney reports employment rates of 0.028 % for males and 0.036 % for females. (*See* Def.s' Ex. 7 at 8.) I have performed the same calculations using his September 1998 data and

In light of these reasons, I hold that defendants have presently achieved sufficient parity of treatment between male and female inmates in the matter of apprenticeship opportunities.

## D.  Work–Pass Opportunities

This area includes defendants' work-pass and public works programs. Plaintiffs have conceded that "[t]he opportunity for women to participate in public works and work pass programming is substantially comparable to the opportunity provided to male prisoners." (Pl.s' Amended Findings of Fact and Conclusions of Law at 21.) Given this concession, I am satisfied that sufficient parity of treatment now exists in the matter of work-pass opportunities.

### Conclusion

My findings of equal protection compliance in the matters of educational, vocational, apprenticeship, and work-pass opportunities require me to terminate my jurisdiction over defendants as to those matters. *See Glover*, 138 F.3d at 243. I conclude therefore that defendants' motion to terminate pursuant to Fed.R.Civ.P. 60(b)(5) is granted.

Yet the fear has been expressed by plaintiffs, sometimes explicitly, but always implicitly, that termination of my jurisdiction over defendants in these matters will prompt defendants to immediately discontinue any and all rehabilitative programming for the female inmates and thereby defeat the progress of the past twenty years. I hope such is not the result. If defendants were to choose that unwise course, the Due Process Clause might be implicated. *See Beard v. Livesay*, 798 F.2d 874, 876 (6th Cir.1986) ("A state, by its own actions, may create liberty interests protected by the due process clause.")

Because the Sixth Circuit has retained jurisdiction in this case, I think it improvident at this time to order termination of my jurisdiction, even though I have concluded that

have determined that he erred in his calculations because he failed to move the decimal upon converting to a percentage figure.

such termination is now proper in light of my finding of parity.