**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

DAVID SCOTT HARRISON,
*Plaintiff-Appellant*,

v.

SCOTT KERNAN; JEFFREY A. BEARD,
*Defendants-Appellees.*

No. 17-16823

D.C. No.
1:16-cv-07103-
NJV

OPINION

Appeal from the United States District Court
for the Northern District of California
Nandor J. Vadas, Magistrate Judge, Presiding

Argued and Submitted July 13, 2020
San Francisco, California

Filed August 21, 2020

Before: Eugene E. Siler,[*] Richard C. Tallman, and
Danielle J. Hunsaker, Circuit Judges.

Opinion by Judge Tallman

---

[*] The Honorable Eugene E. Siler, United States Circuit Judge for the
U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

## SUMMARY[**]

### Prisoner Civil Rights

The panel vacated the district court's summary judgment in favor of defendant prison officials in an action brought pursuant to 42 U.S.C. § 1983 by a California prisoner who alleged that prison officials discriminated against him based on his male gender by not allowing him to purchase certain prison vendor products available only to female inmates.

The panel first held that plaintiff sufficiently demonstrated that he had standing to bring his equal protection challenge to the Department's regulation governing inmates' personal property. The panel then held, following the lead of at least two sister circuits, and mindful of the deference owed to prison officials in light of the special difficulties that arise in the prison context, that intermediate scrutiny applies to claims challenging prison regulations which facially discriminate on the basis of gender.

In vacating the district court's summary judgment, the panel noted that this Circuit had not yet established intermediate scrutiny as the applicable standard at the time the district court reviewed the regulation at issue in this case. The panel therefore remanded so that the district court could determine in the first instance whether the Department's regulation survived intermediate scrutiny, bearing in mind that gender-based distinctions must be rooted in reasoned

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

analysis by policymakers, rather than the mechanical application of traditional, often inaccurate assumptions about gender.

## COUNSEL

Samir Deger-Sen (argued) and Adam J. Tuetken, Latham & Watkins LLP, Washington, D.C., for Plaintiff-Appellant.

Joshua Patashnik (argued), Deputy Solicitor General; Kristin A. Liska, Associate Deputy Solicitor General; Preeti K. Bajwa, Deputy Attorney General; Misha D. Igra, Supervising Deputy Attorney General; Edward C. DuMont, Solicitor General; Xavier Becerra, Attorney General; Office of the Attorney General, San Francisco, California; for Defendants-Appellees.

## OPINION

TALLMAN, Circuit Judge:

This case requires us to decide what level of scrutiny should be applied to equal protection challenges of prison regulations which facially discriminate on the basis of gender. Following the lead of at least two of our sister circuits, and mindful of the deference owed to prison officials in light of the special difficulties that arise in the prison context, we conclude that intermediate scrutiny applies to such claims. Because we had not yet established intermediate scrutiny as the applicable standard at the time the district court reviewed the regulation at issue in this case, we follow our normal practice of remanding to the district

court to determine in the first instance whether Defendants have met the standard we outline today.

I

A

Plaintiff David Scott Harrison is a California state prisoner housed in San Quentin State Prison, California's oldest and best-known correctional institution. In 2016, Harrison, proceeding pro se, filed a civil rights suit in California superior court against two now-former secretaries of the California Department of Corrections and Rehabilitation ("CDCR" or "the Department"), Scott Kernan and Jeffrey Beard. In his complaint, brought under 42 U.S.C. § 1983, Harrison alleged that CDCR Secretary Kernan and his predecessor Secretary Beard discriminated against him based on his male gender by not allowing him to purchase certain prison vendor products available only to female inmates.[1] The Department removed the action to federal court.

Before further describing the procedural history of Harrison's suit, an explanation of the regulations under which California manages its inmate personal property regime is necessary. The following recitation of the history and specifics of the regulation Harrison challenges is drawn from the record developed over the course of summary judgment proceedings in the district court as well as the

_____

[1] Harrison sued Kernan and Beard in their individual capacities for purposes of his damages claim and in their official capacities for purposes of his claim for injunctive relief. The current CDCR Secretary, Ralph Diaz, is the relevant party for Harrison's injunctive relief claim. *See* Fed. R. App. P. 43(c)(2). The Department is litigating this case on behalf of all of the defendants.

administrative record supplied to us on appeal via the Department's motion to take judicial notice.[2]

B

Title 15 of the California Code of Regulations outlines the procedures for determining the personal property that may be purchased from various contracted vendors by California state prison inmates at their own expense. *See* Cal. Code Regs. tit. 15, § 3190.    The Standardized Procedures Unit of CDCR's Division of Adult Institutions oversees and administers the inmate property regime and develops Authorized Personal Property Schedules identifying allowable property an inmate may acquire and possess. *Id.*  Until 2007, the Department maintained a single personal property schedule that applied to imprisoned men and women alike, regardless of security level or institution mission.[3]   Five new schedules were proposed in August 2007 and finalized in May 2008.   Those schedules corresponded to different categories of institutions housing adult inmates and, because imprisoned women in California are housed at separate institutions from imprisoned men, necessarily included a separate schedule for female offender programs.

---

[2] We grant the Department's unopposed motion to take judicial notice, as well as Harrison's request that we take judicial notice of the relevant regulatory history of the challenged prison regulation set forth in *Greene v. Tilton*, No. 2:09-cv-00793-JAM JFM, 2012 WL 691704 (E.D. Cal. Mar. 2, 2012).

[3] The pre-2007 property schedule did distinguish between certain items of clothing and hygiene items available to imprisoned women but not imprisoned men.   For example, only women could purchase brassieres and panties, as well as certain hair care products and make up.

Revised again in 2014, each property schedule now corresponds to a security-driven categorization of inmates: 1) male reception center inmates; 2) Level I, II, and III male inmates in general population; 3) Level IV male inmates in general population; 4) male inmates in Administrative Segregation, Secure Housing, or Psychiatric Service Units; and 5) female inmates. Within each schedule, the type and amount of property an inmate is permitted is further determined by the inmate's privilege group.[4]

Items whose availability depends at least in part on inmate gender include, *inter alia*: products that contain small metal pieces or otherwise may be used as a weapon, such as hair dryers and electric curling irons, as well as bath robes, scarves, kimonos, and bath towels, which could be used for strangulation; clothing, such as denim jeans, that "would allow [inmates] to blend in with the general public" and thus could be used to disguise escaped prisoners; sugary foods that could be used to make an alcoholic beverage known as "pruno"; and items which the Department claims could give rise to disputes over gambling or money, such as necklaces and bracelets, as well as the card game Uno. For the purpose of this appeal, it is undisputed that under the current property

---

[4] There are four security classification levels for inmates in California prisons, with Level IV inmates posing the highest security risk. *See* Cal. Code Regs. tit. 15, § 3377. An inmate's classification level is assigned upon admission based on multiple factors. It is undisputed that the Department uses an identical methodology to determine the security classification of male and female inmates, as well as to determine their privilege groups. *See id.* § 3375 ("The classification process shall be uniformly applied, commencing upon reception of a person committed to the custody of the Secretary and shall continue throughout the time the individual remains under the Secretary's jurisdiction."); § 3044 (code section governing inmate privilege group classifications, making no mention of, or otherwise distinguishing between inmates based on, gender).

regulation female inmates of the *highest* security classification housed in general population have access to more personal property than male inmates in the *lowest* security classification housed in general population.

## C

After removing Harrison's suit to federal court, the Department moved for summary judgment. In support of its motion it submitted a nine-page declaration by Captain Bickham, commanding officer of the Department's Standardized Procedures Unit, as well as copies of the challenged regulation, the Department's Operations Manual, the property schedules, and two pages of COMPSTAT statistics from 2015.[5] Captain Bickham's declaration also referenced and provided a link to a 2012 study by the National Gang Crime Research Center. Harrison, still proceeding pro se, opposed summary judgment in part on the basis that he had not received sufficient responses to his discovery requests, and asked for a continuance in order to conduct further discovery under Fed. R. Civ. P. 56(d).

The district court granted summary judgment in favor of the Department and denied Harrison's cross-motion, including his Rule 56(d) request, without a hearing.[6] In its order, the district court largely recited the facts set forth in Captain Bickham's declaration. It then turned to whether Harrison's identified classes of inmates—male inmates and

---

[5] COMPSTAT is the name for the Department's computerized system for "collecting, validating, and reporting strategic and operational performance data for business management purposes." *See* https://www.cdcr.ca.gov/research/compstat/.

[6] Harrison does not challenge on appeal the district court's Rule 56(d) ruling or other discovery orders.

female inmates of the same or greater security classification—are similarly situated for the purpose of an equal protection analysis. The court concluded that the classes are not similarly situated because male and female inmates are not housed together, the facilities housing female inmates are generally smaller than the facilities for male inmates, and female inmates exhibit substantially less dangerous behavior than male inmates. Holding that Harrison had therefore failed to show that he is treated differently than a similarly situated group, the court went on to find that even if imprisoned men and women were similarly situated, Harrison still would not be entitled to relief because, under *Turner v. Safley*, 482 U.S. 78, 89 (1987), the challenged regulation is "reasonably related to legitimate penological interests."

Harrison timely appealed the district court's order. After Harrison filed his pro se opening brief and the Department filed its answering brief, our Appellate Commissioner appointed pro bono counsel for Harrison, ordered replacement briefing, and directed the clerk of court to strike the previously tendered briefs.[7] After a new round of briefing, we heard argument and submitted the case for decision.

## II

In its original answering brief on appeal, the Department argued that Harrison lacked standing to pursue his equal protection claims. In its replacement (and now operative)

---

[7] This particular procedural history is worth noting because after Harrison was appointed pro bono counsel, the Department significantly changed its litigating position on several key issues in this appeal, as will be explained further *infra*. We have been greatly aided by pro bono counsel in considering this case.

brief, the Department concedes that Harrison has standing to challenge the *existence* of separate property schedules for male and female inmates but maintains that he does not have standing to challenge differences in access to any *particular* items of property because "he has never sought access to any specific item of property, and thus cannot establish that he has suffered concrete, particularized injury as a result of the denial of any item of property." Appellees' Br. at 28. We address each of these positions in turn.[8]

The "irreducible constitutional minimum" of standing requires that a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). That constitutional minimum is met here. In his complaint, Harrison alleged that the challenged regulation "prohibit[s him] from purchasing those vendor products the same and equal to those vendor products allowed to similarly situated female prisoners, as well as allowed to those female prisoners of demonstrated greater security risk than [Harrison]." Complaint at 4–5. Thus, he has alleged that he is being denied "equal treatment under law," which is "a judicially cognizable interest that satisfies the case or controversy requirement of Article III." *Davis v. Guam*, 785 F.3d 1311, 1315 (9th Cir. 2015). This is true even if that equal treatment would "bring[] no tangible benefit to the party asserting it." *Id.* Accordingly, Harrison

---

[8] Although the parties now agree that Harrison has Article III standing to allege his equal protection claim at least as to the existence of the separate property schedules, we have an "independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).

has standing to challenge the existence of separate property schedules for male and female prisoners even if he has not tried to place an order for any specific item of property listed only on the property schedule for females.

The Department's further argument that Harrison does not have standing to challenge differences in access to any specific items of property listed in the property schedules unless he has actually attempted to order them appears to us to be a red herring. In his administrative appeal through the Department's prison grievance system, Harrison asked "to be authorized to order, receive, possess, and use" items including "clothing, food, drinks, objects, [and] products" available via the prison's vendors "without regard to my gender or any type of 'women only' restrictions." And in his complaint, Harrison challenged "the processes by which the CDCR makes decisions concerning the vendor products (e.g., clothing, drinks, objects, appliances, foods, etc.) . . . that female prisoners are allowed versus the restricted and limited vendor products Harrison is allowed," and attached vendor catalogs clearly marked to show women-only items. Complaint at ¶ 2 & n.3 ("The specific items challenged that Harrison is unable to purchase, but that female prisoners are allowed to purchase, are marked for identification in [the attached exhibits]."). As a long-term inmate subject to California prison regulations on an ongoing basis, Harrison presumably stands ready and willing to order women-only items if permitted. Taken together, these facts are very likely sufficient to demonstrate Harrison's injury with respect to the specific items that he is unable to order by virtue of his gender. *See, e.g.*, *Gratz v. Bollinger*, 539 U.S. 244, 261–62 (2003) (plaintiff had standing to challenge university's race-conscious transfer admissions policy, despite not having applied as a transfer student, because he showed that he was "able and ready" to do so).

Regardless, standing in this case does not turn on whether Harrison sought or would benefit from any particular item of women-only property. *See, e.g.*, *Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993) ("When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing."). To conclude otherwise could lead to the absurd result that an imprisoned man seeking to challenge the regulation would first need to place futile orders for every women-only product listed in the Department's vendor catalogs before his challenge could proceed. That is not our view of how standing principles apply in equal protection challenges. *See Gratz*, 539 U.S. at 262 (explaining that "[t]he 'injury in fact' in an equal protection case of this variety is the denial of equal treatment from the imposition of the barrier, not the ultimate inability to obtain the benefit" (quoting *Ne. Fla. Chapter of the Associated Gen. Contractors of Am.*, 508 U.S. at 666)).

Moreover, if the Department is raising this argument because it believes neither we nor the district court may look in any detail at the property schedules themselves when adjudicating this case, that argument also is unavailing. As Harrison has pointed out, a reviewing court applying intermediate scrutiny—which, as explained further below, we today adopt as the applicable standard in the prison context for gender-based equal protection claims—needs to examine which items of property are restricted by gender as part of its assessment of the "means-end fit" between the challenged regulation and its purported justifications in order to determine whether the regulation is "grossly over-

[or] under-inclusive" in violation of equal protection principles. *Latta v. Otter*, 771 F.3d 456, 472 (9th Cir. 2014); *see also Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 725 (1982) (requiring a "direct, substantial relationship between objective and means"). Thus, the distinction the Department attempts to draw between standing to challenge the regulation and standing to challenge access to individual items is ultimately one without a difference in this particular case. Even where, as here, the plaintiff has not attempted to purchase specific items, a reviewing court still must examine the details of the property scheme when conducting the equal protection analysis.

In sum, we conclude Harrison has sufficiently demonstrated that he has standing to bring his equal protection challenge of the Department's regulation governing inmates' personal property. We therefore proceed to consider the merits of that challenge.

### III

### A

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). With equal protection claims, then, the "first step . . . is to identify the state's classification of groups" and then "look for a control group . . . composed of individuals who are similarly situated to those in the classified group in respects that are relevant to the state's challenged policy." *Gallinger v. Becerra*, 898 F.3d 1012, 1016 (9th Cir. 2018) (citations

omitted); *see also Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1064 (9th Cir. 2014) ("The groups need not be similar in all respects, but they must be similar in those respects relevant to the Defendants' policy.").

The district court concluded, and the Department argued in its original answering brief on appeal, that male inmates and female inmates of the same or greater security classification are not similarly situated for equal protection purposes. Here again, the Department changed its position after Harrison was appointed counsel, and now essentially concedes that imprisoned men and women of the same security classification are similarly situated for an equal protection analysis of the challenged regulation—i.e., that female inmates of Harrison's security classification are an appropriate control group. *See* Appellees' Br. at 37 (explaining that the Department does "not now contend that this Court should resolve Harrison's appeal . . . solely by concluding that male and female inmates are not similarly situated to each other" as the district court did below).

Independent of the Department's concession, we conclude the undisputed evidence establishes that this is so. According to Captain Bickham, the personal property schedules under the challenged regulation "establish allowable property by the security levels and privilege groups" of inmates. And, as discussed above, the Department uses an identical methodology to determine the security classifications of male and female inmates, as well as to determine their privilege groups. *See supra* n.4. Thus, the only relevant difference between Harrison and an imprisoned woman of the same security level and privilege group, when it comes to allowable property under the Department-wide regulation, is gender. In other words,

gender is the critical independent variable here.[9] Accordingly—and as the parties have already agreed—we conclude that imprisoned men and women of the same security classification subject to the challenged regulation are similarly situated for the purpose of this case.

B

We next must decide what level of scrutiny to apply to the challenged regulation adopting the Department's personal property schedules. *See* Cal. Code Regs. tit. 15, § 3190(b) (incorporating by reference the Department's five current property schedules). We now hold that prison regulations such as this one, which facially discriminate on the basis of gender, must receive intermediate scrutiny; that is, such regulations are constitutional only if the government demonstrates they "serve[] important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *VMI*, 518 U.S. at 533 (citation omitted).

In so holding, we are acutely aware of the uniquely difficult circumstances faced by prison officials as they work to maintain safe conditions in the facilities they are charged

---

[9] We reject the district court's reasoning that male and female inmates are not similarly situated because women are housed in separate facilities. Women are housed separately because of gender, therefore, even under the district court's logic, gender remains the key independent variable controlling the property that inmates of the same security classification may possess. To conclude otherwise would be potentially to preclude equal protection challenges in all cases where men and women are housed separately. That is not the law. *Cf. United States v. Virginia (VMI)*, 518 U.S. 515, 554 (1996) (concluding that Virginia had not shown "substantial equality in the separate educational opportunities the Commonwealth support[ed]" at the all-male Virginia Military Institute and the all-female Virginia Women's Institute for Leadership).

with overseeing. The deference owed to judgments made by prison officials must always be factored carefully into the analysis of inmates' constitutional challenges to prison regulations, and our decision today should not be taken to hold otherwise. As discussed further, *infra*, it is a predominant factor in evaluating the strength of the state interest the Department seeks to advance with its challenged regulation.

1

In its order on summary judgment, the district court applied the deferential standard announced in *Turner v. Safley* to Harrison's gender-based equal protection claim, asking only whether the regulation governing inmate property is "reasonably related to legitimate penological interests." 482 U.S. at 89.[10] In *Turner*, the Supreme Court examined regulations restricting inmate marriage and inmate-to-inmate correspondence. *See id.* at 85–86. The Court acknowledged that while "federal courts must take cognizance of the valid constitutional claims of prison inmates," *id.* at 84, "[r]unning a prison is an inordinately difficult undertaking" presenting "intractable problems," *id.* at 84–85, 89. Employing broad language, the Court declared that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89.

---

[10] The parties now both agree that Harrison's claim triggers a heightened standard of review. Given that no prior Ninth Circuit precedent addressed the appropriate standard of scrutiny afforded to gender-based equal protection claims in the prison context, we cannot fully fault the district court for applying the deferential *Turner* standard advanced by the Department below.

Eighteen years later, in *Johnson v. California*, the Court revisited the issue, this time addressing a California Department of Corrections policy of racially segregating prisoners in double cells in reception centers for up to 60 days each time they entered a new correctional facility. 543 U.S. 499, 502 (2005).    Although the Court acknowledged the Department's need "to prevent violence caused by racial gangs," *id.*, it explained that "*all* racial classifications [imposed by government] . . . must be analyzed by a reviewing court under strict scrutiny" in order to "smoke out illegitimate uses of race by assuring that the [government] is pursuing a goal important enough to warrant use of a highly suspect tool," *id.* at 506 (citation omitted).

Addressing the apparent conflict with *Turner*, the Court reasoned that *Turner*'s reasonable-relationship test applies "*only* to rights that are 'inconsistent with proper incarceration.'"    *Id.* at 510 (quoting *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003)).    Thus, while some "privileges and rights" such as speech, freedom of association, and personal liberty "must necessarily be limited in the prison context[,] . . . [t]he right not to be discriminated against based on one's race. . . is not a right that need necessarily be compromised for the sake of proper prison administration." *Id.*    Rather, the Court explained, "[i]n the prison context, when the government's power is at its apex, . . . searching judicial review of racial classifications is necessary to guard against invidious discrimination."    *Id.* at 511.

By extension—although the Supreme Court has not yet so held—the same is true of the right not to be discriminated against in prison based on gender.    Just as with race, the Court has repeatedly stressed that "'all gender-based classifications today' warrant 'heightened scrutiny.'"    *VMI*, 518 U.S. at 555 (quoting *J.E.B. v. Alabama ex rel. T.B.*,

511 U.S. 127, 136 (1994)); *see also Miss. Univ. for Women*, 458 U.S. at 724 (stating that "the party seeking to uphold a statute that classifies individuals on the basis of their gender must carry the burden of showing an exceedingly persuasive justification for the classification" (citation omitted)). And, like distinctions based on race, which may be based on invidious stereotypes, distinctions based on gender may be improperly based on "archaic and stereotypic notions" or "fixed notions concerning the roles and abilities of males and females."[11] *Id.* at 725; *see also Craig v. Boren*, 429 U.S. 190, 198 (1976) (statutes may not employ "gender as an inaccurate proxy for other, more germane bases of classification"); *Pitts v. Thornburgh*, 866 F.2d 1450, 1454 (D.C. Cir. 1989) (noting, in deciding to apply intermediate scrutiny to a gender-based claim in the prison context post-*Turner* but pre-*Johnson*, that "the Supreme Court has indicated that a facial classification based upon gender, like the one in this case, inherently risks several dangers that the Equal Protection Clause . . . [is] most designed to eradicate").

The Department itself recognizes these concerns, noting in its replacement brief that the "'purpose of requiring' intermediate scrutiny for gender-based distinctions is to ensure that they are rooted in 'reasoned analysis' by policymakers, rather than discriminatory animus or 'the mechanical application of traditional, often inaccurate

---

[11] Take, for example, the Department's statement in the administrative record explaining that female inmates are allowed more hygiene products than male inmates in part because "[t]he Department believes that a female inmate who feels good about how she looks is more amenable to rehabilitation." Absent any citation to data supporting such an assertion, this explanation certainly sounds as though it is based on "archaic and stereotypic notions" about the importance women may place on their physical appearance.

assumptions'" about gender. Appellees' Br. at 38 (quoting *Miss. Univ. for Women*, 458 U.S. at 725–26). We agree. Regulations which facially discriminate on the basis of gender, such as the one at issue here, must receive intermediate scrutiny in order to ensure that they do "not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *VMI*, 518 U.S. at 533. To the extent we have not previously made clear that this is true even in the prison context, we do so now.

2

Although this is our first published opinion on this topic, we have previously noted the applicability of intermediate scrutiny to gender-based equal protection prison claims in at least two unpublished dispositions. *See, e.g.*, *Laing v. Guisto*, 92 F. App'x 422, 423 (9th Cir. 2004) (citing *VMI* in concluding that the plaintiff "failed to provide sufficient evidence to overcome the defendant's showing that the cross-gender searches serve important government objectives, and that its means are substantially related to the achievement of those objectives"); *Goldyn v. Angelone*, No. 97-17185, 1999 WL 728561, at *2 (9th Cir. Sept. 16, 1999) ("Prisoners retain the protections of the Equal Protection Clause upon incarceration" and "[w]hen state actors intentionally classify persons based on gender, those classifications require an exceedingly persuasive justification."). Several of our prior published decisions also have hinted at the applicability of the intermediate scrutiny standard to gender-based equal protection claims in prisons and jails. *See, e.g.*, *Byrd v. Maricopa Cty. Sheriff's Dep't*, 629 F.3d 1135, 1139–40 (9th Cir. 2011) (en banc) (citing with approval *Roubideaux v. N.D. Dep't of Corr. & Rehab.*, 570 F.3d 966 (8th Cir. 2009), and *Pitts*—two out-of-circuit

cases applying intermediate scrutiny—but affirming dismissal of equal protection claim because it was not fully pled); *Jeldness v. Pearce*, 30 F.3d 1220, 1231 (9th Cir. 1994) (recognizing disparate treatment of male and female prisoners, but declining to reach the equal protection question by resolving the case on statutory grounds).

By declaring the applicable standard of scrutiny today, we join the Eighth and D.C. Circuits, which have already adopted intermediate scrutiny in gender-based prison cases. *See Roubideaux*, 570 F.3d at 974–75; *Pitts*, 866 F.3d at 1454–55. The Third and Sixth Circuits have also applied intermediate scrutiny to such claims in unpublished dispositions. *See Dinote v. Danberg*, 601 F. App'x 127, 130 (3d Cir. 2015) ("Even differential treatment is permissible, however, if it bears a sufficient nexus to a qualifying governmental interest; in the case of a gender classification, the state must show that the classification 'serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'" (quoting *VMI*, 518 U.S. at 533)); *Pariseau v. Wilkinson*, No. 96-3459, 1997 WL 144218, at *1 (6th Cir. Mar. 27, 1997) (citing *Miss. Univ. for Women*, 458 U.S. at 724, and applying intermediate scrutiny to a gender-based hair grooming policy); *but see Glover v. Johnson*, 198 F.3d 557, 561 (6th Cir. 1999) (declining to decide the appropriate level of scrutiny for equal protection claims in the prison setting in a published opinion because the district court properly found no disparate treatment).[12]

---

[12] Other circuits either have not yet decided the question, or else have not yet taken the opportunity to address it again after the Supreme Court offered additional guidance in *Johnson v. California*. For example, the Fourth Circuit, in an unpublished disposition, affirmed

This history assures us that in deciding this case we have not ventured into uncharted waters. To the contrary, our decision here not only follows the Supreme Court's directive that all gender-based classifications warrant heightened scrutiny, but it is also in line with the majority of the circuits that have published on this issue.

3

The Department cautions us, however, that when applying intermediate scrutiny to gender-based distinctions drawn by prison officials, we must not "disregard the special difficulties that arise in the prison context." Appellees' Br. at 38 (quoting *Pitts*, 866 F.2d at 1455). We agree, and like the Department, we believe that these circumstances "can be considered" in applying heightened scrutiny, "which is designed to take relevant differences into account." *Id.* (quoting *Johnson*, 543 U.S. at 515).

Our adoption of the intermediate scrutiny standard "should not be read to mean that deference [to prison officials] plays no role in prisoners' constitutional claims." *Harrington v. Scribner*, 785 F.3d 1299, 1307 (9th Cir. 2015)

without comment a district court's application of intermediate scrutiny to a gender-based prison claim, *see DeBlasio v. Johnson*, 13 F. App'x 96 (4th Cir. 2001), but two years later applied *Turner*'s reasonableness standard to another such claim in a published opinion issued before the Supreme Court decided *Johnson*, *see Veney v. Wyche*, 293 F.3d 726, 732 (4th Cir. 2002). Similarly, after *Turner* but before *Johnson*, the Fifth Circuit declined to decide the question of the proper legal standard in *Smith v. Bingham* and appears not to have addressed the issue since. 914 F.2d 740, 742 (5th Cir. 1990) ("In the present case, we need not decide the applicable level of scrutiny for an equal protection claim in a prison setting. Even under the test applied to challenge gender-based distinctions outside of the prison setting, we find no merit in Smith's claim that he has been denied equal protection of the laws.").

(discussing the application of strict scrutiny to a race-based prison claim). Under heightened scrutiny, the deference owed to judgments made by prison officials is factored into the importance of the government's asserted interest; stated differently, "penological interests may still factor into the analysis of an equal protection claim" because such considerations "properly inform whether there exists a[n important state] interest." *Id.* at 1308 (but noting that in considering a race-based claim, those considerations "do not excuse the narrow tailoring requirement").

Indeed, there is no reason to think that intermediate scrutiny will prove fatal to gender-based prison regulations. We have numerous examples of prison officials successfully crafting constitutionally-sound gender-based policies. *See, e.g.*, *Roubideaux*, 570 F.3d at 974–75 (applying intermediate scrutiny and upholding statute that provided for unequal services at male and female prisons); *Pitts*, 866 F.2d at 1462–63 (upholding under intermediate scrutiny a District of Columbia policy of housing female inmates at a prison farther from the District than the male prison); *Dinote*, 601 F. App'x at 130 (applying intermediate scrutiny and upholding practice of transferring female arrestees to an all-female institution within 24 hours of arrest); *Pariseau*, 1997 WL 144218, at *1 (upholding gender-based hair grooming policy under intermediate scrutiny).

Consequently, we note that it is not a forgone conclusion that the Department's current property schedules are unconstitutional. Intermediate scrutiny "does not make sex a proscribed classification," and the Department may ultimately be able to show that the current property schedules are substantially related to the achievement of important penological objectives. *VMI*, 518 U.S. at 533. All that we hold today is that intermediate scrutiny, rather than

the deferential *Turner* standard, must be applied to decide Harrison's equal protection challenge.

IV

In keeping with our standard practice, we vacate the order on summary judgment and remand so that the district court may determine in the first instance whether the Department's regulation survives intermediate scrutiny. *See, e.g.*, *United States v. Sellers*, 906 F.3d 848, 855 (9th Cir. 2018) ("Because the district court applied an incorrect legal standard, we follow our normal practice of remanding to the district court to determine in the first instance whether [the defendant] has met the standard we outline today."). The record developed by the Department below was intended to meet *Turner*'s deferential standard rather than the more stringent standard we announce today, therefore on remand the district court should take into account the materials included with the Department's motion to take judicial notice on appeal, as well as any additional materials the parties may submit with their renewed summary judgment papers.[13]

We recognize that both parties have urged us to fully resolve this case based on the current record, but we decline that invitation. On appeal, the Department has raised at least one significant new justification in support of the regulation that it did not raise below; namely, that the Department was acting to remedy "historical unfairness toward female inmates in part by giving them access to a broader array of personal property." Appellees' Br. at 53. While this

---

[13] The district court also should decide, in the first instance, whether Defendants Kernan and Beard in their individual capacities are entitled to qualified immunity from Harrison's claims.

justification may well be true, and if true is certainly laudable, it should properly be developed in district court and then factored into the intermediate scrutiny analysis.**[14]** *See, e.g.*, *Armstrong v. Davis*, 275 F.3d 849, 874 (9th Cir. 2001) (abrogated on other grounds by *Johnson*, 543 U.S. 499) (government may not introduce a new penological justification for the first time on appeal); *see also Dream Palace v. County of Maricopa*, 384 F.3d 990, 1005 (9th Cir. 2004) (rule against considering new arguments for the first time on appeal "serves to ensure that legal arguments are considered with the benefit of a fully developed factual record, offers appellate courts the benefit of the district court's prior analysis, and prevents parties from sandbagging their opponents with new arguments on appeal").

In closing, we note that at oral argument the Department assured us that it has access to more data it can proffer in support of its current personal property schedules. It is not enough, under intermediate scrutiny, for the Department only to demonstrate "empirical relationships" between gender and the various propensities against which it seeks to protect—in this instance, alleged male propensities towards violence, gang membership, and escape attempts. Rather, the Department must show that those relationships "adequately justify the salient features of" the challenged regulation. *Craig v. Boren*, 429 U.S. at 200–03 (holding that data showing, for example, that "18–20-year-old male

---

**[14]** Harrison points out that the evidence included with the Department's motion to take judicial notice does not actually support its assertions as to this justification. *See, e.g.*, Unopposed Motion to Take Judicial Notice, ECF No. 46 at 86 (Department's initial statement of reasons, which makes no mention of remedies for past gender discrimination or unresponsiveness to the needs of women in prison).

arrests for 'driving under the influence' and 'drunkenness' substantially exceeded female arrests for that same age period" was inadequate to justify a law differentiating between males and females aged 18 to 21 for the purchase of 3.2% beer because the data failed to "measure the use and dangerousness of 3.2% beer as opposed to alcohol generally," and made "no effort to relate [those] findings to age-sex differentials as involved here").

Perhaps the Department can successfully justify its property regulation by comparing the number of violent incidents at lower security male facilities or by lower security male prisoners with the number of violent incidents at female prisons or by higher security female prisoners.[15] Such a comparison may well demonstrate that the Department is justified in allowing women of the highest security classification in general population to possess items that men at the lowest security classification in general population cannot. This determination will be for the district court to make, bearing in mind that gender-based distinctions must be rooted in reasoned analysis by policymakers, rather than the mechanical application of traditional, often inaccurate assumptions about gender. *See Miss. Univ. for Women*, 458 U.S. at 725–26.

The judgment of the district court is **VACATED** and the case is **REMANDED** with instructions.

---

[15] Instead, the COMPSTAT data attached to Captain Bickham's declaration shows only that in 2015, the total number of violent incidents across *all* categories was higher in male prisons than in female prisons.